**UNITED STATES of America,
Plaintiff-Appellee,**

**v.**

**Phillip John ELLSWORTH,
Defendant-Appellant.**

**No. 80–1369.**

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted Feb. 5, 1981.

Decided June 8, 1981.

As Amended Sept. 15, 1981.

Lawrence J. Kulik, Kulik & Suddock, Anchorage, Alaska, for defendant-appellant.

Dan Dennis, Asst. U. S. Atty., Anchorage, Alaska, argued for plaintiff-appellee; Nelson Cohen, Asst. U. S. Atty., Anchorage, Alaska, on brief.

Before BROWNING, Chief Judge, TANG, Circuit Judge and HEMPHILL,* District Judge.

HEMPHILL, District Judge:

Appellant appeals from the final judgment of the district court, entered May 23, 1980, after a jury finding of guilt March 14, 1980. The superseding indictment was lodged with the Court October 23, 1979, upon the finding of a true bill by the Grand Jury, and charged:

That on or about the 15th day of October, 1979, Anchorage, Alaska, in the District of Alaska, PHILLIP JOHN ELLSWORTH, unlawfully, wilfully and by means of a dangerous weapon, that is, a pair of black leather type gloves weighted in the areas of the knuckles, did forcibly assault, resist, oppose, impede, intimidate and interfere with Jerry Lee Cox, a Petroleum Engineer Technician of the Conservation Division of the United States Geological Service of the Department of the Interior, while he was engaged in the performance of his official duties, all in violation of Title 18, United States Code, Section 111[1] and 1114.[2]

Appellant was sentenced to the custody of the Attorney General, or his authorized representative, for a period of three (3) years. He presents five issues for review by this court, seriatim.

## SALIENT FACTS

On October 15, 1979 the victim in this case, Jerry Lee Cox, was employed by the United States Geological Survey (USGS) of the Department of the Interior of the United States as a Petroleum Engineer Technician. His duties included inspections to enforce safety and environmental regulations concerning oil rig drilling apparatus and

---

* Honorable Robert W. Hemphill, Senior United States District Judge for the District of South Carolina, sitting by designation.

1. 18 U.S.C. § 111 provides:
    § 111. ASSAULTING, RESISTING, OR IMPEDING CERTAIN OFFICERS OR EMPLOYEES
    Whoever forcibly assaults, resists, opposes, impedes, intimidates, or interferes with any person designated in section 1114 of this title while engaged in or on account of the performance of his official duties, shall be fined not more than $5,000 or imprisoned not more than three years, or both.
    Whoever, in the commission of any such acts uses a deadly or dangerous weapon, shall be fined not more than $10,000 or imprisoned not more than ten years, or both.

2. 18 U.S.C. § 1114 reads, in part:
    § 1114. PROTECTION OF OFFICERS AND EMPLOYEES OF THE UNITED STATES GOVERNMENT
    Whoever kills any . . . officer or employee of the . . . Department of the Interior designated by the . . . Secretary of the Interior to enforce any Act of Congress for the protection, preservation, or restoration of game and other wild birds and animals, . . . or any officer or employee of the . . . Department of the Interior . . . assigned to perform investigative, inspection, or law enforcement functions, while engaged in the performance of his official duties, . . . .

operations that called for observation and testing of casing, cement, and plug and abandonment operations. If regulations were violated, he had authority to shut down the operation. The well in question had been shut down by a workers' strike, and inspection was required before operations could resume. Pursuant to a request by the oil company conducting operations, Cox's supervisor, Louis Dale Roberts, instructed him to travel on October 15, 1979, to the National Petroleum Reserve of Alaska on the North Slope of Alaska to inspect test well No. 1, Rig 25. According to Cox, Roberts, and their department regulations, Cox was on duty on the job when he left his house to travel to the airport, where he was to enplane for the North Slope.

At about 6:00 A.M. that day a large gathering had collected in the parking lot of Great Northern Air terminal at Anchorage. Some carried picket signs. Those inside the terminal had crossed the picket line to fly north to work causing expectations that something would happen. Two men in the terminal "stood out" from the rest in that they had no luggage, no arctic gear and did not check in at the counter. One of them wore black leather gloves inside the terminal and repeatedly slammed his gloves together. He was the larger of the two and comparably larger than almost anyone else there at the time.

Cox arrived at the terminal, checked his bags, and went to the coffee machine where he poured a cup. While standing there with the cup in one hand and his parka in the other, he was struck on the left side of his face. The assailant was heard to say "You goddam scabs are going to take away all our jobs." The attack was completely unprovoked.

The United States presented eyewitness testimony, physical evidence and an admission by the defendant to prove identity.[3] It never stipulated to Ellsworth's identity as the attacker although the defense offered such a stipulation. Cox testified the attacker was a large man, over 6 feet 2 inches tall, 220 pounds in weight, wearing a dark jacket and dark gloves. He pointed to Ellsworth at trial as the person he believed to have struck him. Additionally, William L. Hess, who was also enroute to NPRA to work on Rig 25 as a roughneck, saw the unprovoked attack. In open court he identified Ellsworth as the man who struck Cox.

FBI agents interviewed Roy L. Waldrop and showed him a group of photographs; based on his recollection of the assault, he chose, although he couldn't be sure about it, a picture of Ellsworth as being the attacker, and this was admitted without objection. In addition to these in-court photographic identifications of Ellsworth as Cox's attacker, the jury viewed a T-shirt with the words "Satisfaction Guaranteed" on the front in glittering letters, which was allegedly worn by the attacker and later found pursuant to a search authorized by warrant at Ellsworth's house. That search also produced a pair of black leather gloves weighted in the knuckles and found in Ellsworth's bedroom. Those were admitted without objection. Other dark color gloves were also found there. Cox's attacker was described to have worn gloves by witnesses Nanini, Hess, Waldrop, and Smalley.

I

## WAS APPELLANT'S RIGHT TO DUE PROCESS OF LAW VIOLATED BY THE MANNER IN WHICH FOUR STATEMENTS OF POTENTIAL WITNESSES WERE PRODUCED TO APPELLANT'S COUNSEL?

On February 29, 1980, Ellsworth filed requests for exculpatory evidence. The United States responded March 3 by acknowledging its duty under *Brady v. Maryland*, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), but opposing delivery of *Brady* materials, if any there were, until trial. The opposition was based in part upon the stated desire to protect anticipated government witnesses who had expressed grave concern for their safety and feared reprisals. The

---

**3.** In opening statement defense counsel stated: "No one has questioned, as I have said before, that the assault occurred \* \* \* Mr. Ellsworth did, indeed, give him a black eye".

United States further responded that it would produce *Brady* materials, if any there were, and that it did not consider minor discrepancies in eyewitnesses' descriptions to be *Brady* material, and that it possessed no exculpatory evidence tending to show that Ellsworth did not commit the attack. In an Order dated March 6, 1980, the pretrial magistrate instructed the United States to comply with the following *Brady* requests by producing any such evidence *at trial*:

1. any and all statements or evidence of statements, hearsay or otherwise, which describe or identify defendant Phillip Ellsworth in any manner inconsistent with Ellsworth's actual description and identification;

2. any statements or evidence of statements which describe or identify defendant Phillip Ellsworth in a manner that is inconsistent with each other;

3. any statements which describe the gloves worn by Cox's alleged assailant in any manner other than as "weighted gloves" or "sap gloves" or any other such expression which denotes or connotes that the assailant's gloves were extraordinary in design or designed to be used as a weapon;

4. any statements by any witnesses describing any T-shirt worn by the alleged assailant which descriptions are either

    (a) inconsistent with each other; or

    (b) inconsistent with the T-shirt seized at Mr. Ellsworth's home by Special Agents of the FBI on or about October 24, 1979.

The magistrate's Order also required the United States to disclose *immediately* the *Brady* material requested by Ellsworth in request No. 5 which reads:

5. any evidence, whether statements of witnesses or otherwise, indicating or suggesting that Mr. Jerry Lee Cox was struck by anyone other than defendant Phillip Ellsworth on October 15, 1979; this request is intended to include evidence that anyone in addition to Mr. Ellsworth struck Mr. Cox.

The United States produced no evidence indicating that Cox was struck by anyone other than or in addition to Ellsworth and maintained that it had no such evidence.

On March 12, 1980, prior[4] to the making of opening statements by either party, Assistant United States Attorney Nelson P. Cohen delivered to defense counsel John Suddock, at defense counsel's table in the Courtroom, copies of the statements of Dora Holmes, Mary Hicks, Michael Nichols and Ed Parsons.

After trial, Dora Holmes was re-interviewed by an FBI agent. She was shown a photographic spread out of which she chose Ellsworth as the person she saw hit Cox on October 15, 1979. She stated: "That's him. I am sure that is definitely him". In her affidavit she had stated that 1) two men came into the terminal, one larger than the other; and 2) the larger man was dressed in a dark leather jacket, gloves and heavy boots, and went over near the coffee machine and struck Cox.

In a post-trial interview of Mary Hicks, she stated that she saw two big men come into the terminal; the large man, wearing black leather gloves and a black leather jacket, struck Cox.

During preparation for trial an interview of Michael Nichols was conducted by FBI agents, in which he was unable to pick Ellsworth out of a photographic line-up. In a post-trial affidavit, Nichols stated: "My location during the assault was such that I did not have a full face view of the assailant. I saw his face from an angle for a fraction of a second during the assault."

Ed Parsons, a 73 year old man, gave a statement after the incident that the man who struck Cox was over seven feet tall. Parsons was unable to describe any clothing and did not pick Ellsworth from a photo spread. He was sitting near Nichols at the time of the attack.

---

4. At one juncture in the processing of the post-conviction motion for a new trial defendant's counsel contended that the information was furnished *after* opening statements, but did not substantiate this claim.

■ This Court's consideration of the conduct of counsel for the government, in this and every case, attends the guidelines espoused by the United States Supreme Court:

> The United States attorney is the representative not of an ordinary party to a controversy, but of a sovereignty whose obligation to govern impartially is as compelling as its obligation to govern at all; and whose interest, therefore, in a criminal prosecution is not that it shall win a case, but that justice shall be done. As such, he is in a peculiar and very definite sense the servant of the law, the twofold aim of which is that guilt shall not escape or innocence suffer. He may prosecute with earnestness and vigor—indeed, he should do so. But, while he may strike hard blows, he is not at liberty to strike foul ones. It is as much his duty to refrain from improper methods calculated to produce a wrongful conviction as it is to use every legitimate means to bring about a just one.[5]

This Court, upon examination of the record, does not find the conduct of the prosecution to rise to the level of a denial of Due Process or of such impact as to deny defendant a fair trial. We are not confronted with perjured testimony or a statement of an accomplice or codefendant, as in *Brady, supra*, nor with evidence that would affect the outcome of the trial. Since *Brady* rejected the test of good faith or bad faith of the prosecutor, we must reckon with the judgment call made by the prosecutor that the evidence was not exculpatory,[6] and a finding by the trial judge, *after reviewing the entire record*, that the disclosure of the statements at the beginning of trial was not of sufficient significance to result in the denial of defendant's right to a fair trial. *See United States v. Agurs, supra.*[7] Believing that a prosecutor should not only avoid unfairness but the appearance of unfairness, we do not condone the withholding of these statements until just prior to opening arguments; we observe that such conduct should not be the usual practice.

Our review convinces us that the conduct did not meet the four requirements for a due process violation as prescribed in *Agurs, supra*, and *United States v. Baxter*, 492 F.2d 150, 173–174 (9th Cir. 1973).[8] The evidence was not suppressed by the prosecutor here; it was tardily produced, but it was produced *before* opening statements. No request was made for a recess, continuance, postponement or mistrial. Only after defendant had taken his chance with the jury was the issue raised. We find no error in such proceedings. *See, e. g., United States v. Ramirez*, 608 F.2d 1261, 1264–65 (9th Cir. 1979) (no prejudice when information received the morning of trial and defendant could have moved for continuance); *United States v. Smith*, 609 F.2d 1294, 1302–03 (9th Cir. 1979) (no prejudice when received after testimony began despite order to produce before trial); *United States v. Burke*, 506 F.2d 1165 (9th Cir. 1974) (failure of defense counsel to read statement produced at close of government's case is not prosecutorial error.)

The record reveals that an airport police report was in the government's file several months before trial, but that the government remained unaware of it until after trial. The report does not contain information of such materiality or impact as to create a reasonable doubt that did not

---

5. *Berger v. United States*, 295 U.S. 78, 88, 55 S.Ct. 629, 633, 79 L.Ed. 1314, 1321 (1935).

6. "If evidence highly probative of innocence is in his [prosecutor's] file, he should be presumed to recognize its significance even if he has actually overlooked it." *United States v. Agurs*, 427 U.S. 97, 110, 96 S.Ct. 2392, 2400, 49 L.Ed.2d 342 (1976).

7. *See also, Moore v. Illinois*, 408 U.S. 786, 92 S.Ct. 2562, 33 L.Ed.2d 706 (1972); *United States v. Shelton*, 588 F.2d 1242, 1249 (9th Cir. 1978); *United States v. Bracy*, 566 F.2d 649, 656 (9th Cir. 1977).

8. "To establish a violation of due process, the defendant must show (1) a request by the defendant for favorable evidence possessed by the prosecutor, (2) suppression of evidence by the prosecutor, (3) that the evidence suppressed is favorable to the defendant and (4) that the evidence is material."

otherwise exist. *See United States v. Ramirez*, 608 F.2d at 1265. The hearsay statement in the report, of a disclaimer by Cox, would not give rise to a reasonable doubt in light of the entire record.

## II

## DID THE INDICTMENT FAIL TO ALLEGE AN ESSENTIAL ELEMENT OF THE CRIME?

Appellant complains that the indictment is fatally defective because it fails to allege that Cox was a Department of Interior employee assigned to one of the duties enumerated in 18 U.S.C. § 1114. That section makes it a crime to, *inter alia*, assault "any officer or employee . . . assigned to perform investigative, inspection, or law enforcement functions". We disagree.

Rule 7(c)(1), Federal Rules of Criminal Procedure, requires:

> The indictment or the information shall be a plain, concise and definite written statement of the essential facts constituting the offense charged.

We examine the indictment in the light of a previous announcement of this Court in *United States v. Pheaster*, 544 F.2d 353, 360 (9th Cir. 1976) [citing and quoting *Russell v. United States*, 369 U.S. 749, 763, 82 S.Ct. 1038, 1046, 8 L.Ed.2d 240 (1962) and *Smith v. United States*, 360 U.S. 1, 9, 79 S.Ct. 991, 996, 3 L.Ed.2d 1041 (1959)] that " 'convictions are no longer reversed because of minor and technical deficiencies which did not prejudice the accused' ". Restating the *Russell* criteria to be used in evaluating a challenged indictment, we stated:

> These criteria are, first whether the indictment contains the elements of the offense intended to be charged, and sufficiently apprises the defendant of what he must be prepared to meet, and, secondly, in case any other proceedings are taken against him for a similar offense, whether the record shows with accuracy to what extent he may plead a former ac-

quittal or conviction. (citations and quotation marks omitted)

■ The indictment follows the statute and alleges the time, place and manner of the violation of law, that the victim was assaulted, and that the victim came within the ambit of 18 U.S.C. §§ 111 and 1114. It also charges the victim's official capacity and that he was on duty. Ellsworth was sufficiently advised of the charge—the crux was the assault, not the job description particulars of one alleged to be "on duty". *See United States v. Tijerina*, 407 F.2d 349, 353 (10th Cir. 1969). The tests of *Pheaster* are met, and Rule 7(c)(1) is complied with. Moreover, the record reveals this issue was raised only in post-trial proceedings. Thus, a liberal construction would be the rule, *United States v. Pheaster, supra*, and even if there were a missing statutory element, it could be easily implied from the language used in this indictment. *See Kaneshiro v. United States*, 445 F.2d 1266, 1269 (9th Cir. 1971).

## III

## DID THE TRIAL COURT FAIL TO CHARGE AN ESSENTIAL ELEMENT OF THE OFFENSE?

■ Appellant also contends the trial judge erred by failing to instruct the jury that they must find the person assaulted was a member of one of the classes of federal employees designated by 18 U.S.C. § 1114. The following instructions given the jury are pertinent to this issue:

### INSTRUCTION NO. 7

Section 111 of Title 18 of United States Code provides in part:

> Whoever forcibly assaults, resists, opposes, impedes, intimidates, or interferes with any person designated in Section 1114 of this title while engaged in or on account of the performance of his official duties;

shall be guilty of an offense against the law of the United States; and further provides that:

> Whoever, in the commission of any such acts uses a . . . dangerous weapon

shall be punished as provided by law.

## INSTRUCTION NO. 8

Three essential elements are required to be proven in order to establish the offense charged in the indictment:

FIRST: That the defendant forcibly assaulted an officer of the United States Geological Service of the United States Interior Department, while such officer was engaged in the performance of his official duties, as charged;

SECOND: That the defendant used a dangerous weapon in the commission of the forcible assault, as charged; and

THIRD: That the defendant did such acts willfully.

## INSTRUCTION NO. 9

Section 1114 of Title 18 of the United States Code describes various categories of federal officers and employees including the following:

"Any officer or employee of ... the Department of the Interior ... assigned to perform investigative, inspection, or law enforcement functions, while engaged in the performance of his official duties, ..."

Whether or not, at the time of the alleged assault, Mr. Cox was acting in an official capacity in the performance of his official duties is a question for the jury to decide from all the evidence in the case.

## INSTRUCTION NO. 10

Among the official duties of officers and agents of the United States Geological Service of the United States Interior Department are inspections of oil drilling apparatus to insure compliance with various Federal laws.

We think the above language of the charge employed by the trial judge reveals no insufficiency in defining the offense. 18 U.S.C. § 111 not only protects the person named in 18 U.S.C. § 1114 who is "engaged in the performance of his official duties," but also protects anyone assaulted "on account of the performance of his official duties." *United States v. Heck*, 499 F.2d 778, 792 (9th Cir. 1974). Furthermore, the charges given are approved as proper in prosecutions involving the statutes here involved. *See* Mathes and Devitt, *Federal Jury Practice and Instructions* (1965), § 20.-01 *et seq.*

The charge was without error.

## IV

## WAS THE SEARCH WARRANT ISSUED WITHOUT SUFFICIENT FACTUAL BASIS?

■ Appellant's attack on the issuance of the search warrant is that "the affidavit's (Steele, FBI Agent, affiant) fatal deficiency is that it sets forth no facts that would lead a neutral and detached magistrate to conclude that probable cause existed to believe that Phillip Ellsworth committed any assault". This Court does not agree. The affidavit the magistrate relied on gave the source of the agent's belief that Ellsworth was the one engaged in the criminal activity which spawned the application for a search warrant. The sources named were eye witnesses from the general public, not professional witnesses. Supporting evidence of cause is found in the descriptions of Ellsworth and his clothing, and the fact that Ellsworth had been indicted for assault.

In addition to the information supplied by the witnesses on the scene identifying appellant with the alleged crime, and thus targeting his house as the possible location of critical evidence, we have the indictment. The magistrate has the same right as the court to take judicial notice, *United States v. Sevier*, 539 F.2d 599, 603 (6th Cir. 1976), and affiant having advised the magistrate of the indictment, the information was before him. Reading the affidavit in a common sense and realistic fashion, *United States v. Carignan*, 600 F.2d 762, 764 (9th

Cir. 1979), the magistrate was not in error in finding probable cause.

■ Our examination is guided by those cases holding that only the probability, and not a prima facie showing, of criminal activity is the standard for probable cause. *Spinelli v. United States*, 393 U.S. 410, 419, 89 S.Ct. 584, 21 L.Ed.2d 637, 645 (1969), citing *Beck v. Ohio*, 379 U.S. 89, 96, 85 S.Ct. 223, 13 L.Ed.2d 142, 147 (1964).[9] And in judging probable cause, issuing magistrates are not to be confined by niggardly limitations or by restrictions on the use of their common sense. *United States v. Ventresca*, 380 U.S. 102, 108, 85 S.Ct. 741, 13 L.Ed.2d 684, 689 (1965).

The Supreme Court has held that the affidavit in support of a warrant may be based on hearsay if underlying circumstances, known to the magistrate, are credible or reliable. *Jones v. United States*, 362 U.S. 257, 80 S.Ct. 725, 4 L.Ed.2d 697 (1960); *Rugendorf v. United States*, 376 U.S. 528, 84 S.Ct. 825, 11 L.Ed.2d 887 (1964); *Aguilar v. Texas*, 378 U.S. 108, 84 S.Ct. 1509, 12 L.Ed.2d 723 (1964). There is no showing but that the magistrate was neutral and detached. A substantial basis for crediting the hearsay may be found in the fact that *six* witnesses gave the hearsay information, no one of whom was an officer. This credible information, coupled with the fact of indictment, was a sufficient basis for issuing the search warrant.

■ We are not persuaded by the government's argument that a magistrate can rest a decision as to probable cause to search on the mere fact of a previous indictment. A Grand Jury is not a court, and its spectrum of responsibility does not include the duty of determining probable cause or lack thereof to search, nor the making of a decision as to whether a search warrant should issue. It determines only whether there is sufficient evidence to cause an ac-

cused to stand trial before a petit jury. *United States v. Levinson*, 405 F.2d 971 (6th Cir. 1968). We find no authority for holding, and do not so hold here, that an indictment alone constitutes sufficient probable cause to issue a search warrant.

## V

## WAS THE EVIDENCE SUFFICIENT TO SUPPORT A VERDICT OF GUILTY OF ASSAULT WITH A DEADLY WEAPON?

At the close of the government's case appellant moved for a judgment of acquittal on the charge of assault with a deadly weapon. The trial judge, testing the sufficiency of the evidence under the guidelines of *United States v. Kaplan*, 554 F.2d 958 (9th Cir. 1977), refused the motion initially and upon post-trial renewal. A court reviewing that decision uses the same test, *United States v. Farris*, 614 F.2d 634, 638 (9th Cir. 1979); *United States v. Leal*, 509 F.2d 122, 125 (9th Cir. 1975); *United States v. Nelson*, 419 F.2d 1237, 1241 (9th Cir. 1969):

> That is, viewing the evidence in a light most favorable to the government as prevailing party, is the court satisfied that the jurors reasonably could decide that they would not hesitate to act in their own serious affairs upon factual assumptions as probable as the conclusions that the defendant is guilty as charged?

*United States v. Kaplan*, 554 F.2d at 963.

■ The government positions that the fact weighted gloves were found in appellant's house and near the T-shirt with the identifying insignia, together with other testimony as to the manner and viciousness of the attack, supply strong circumstances sufficient to support the conclusion that weighted gloves were used as a dangerous weapon.[10] There is simply no evidence link-

---

9. *See also United States v. Fried,* 576 F.2d 787 (9th Cir. 1978).

10. Appellant did not argue that weighted gloves, if used in an assault, are not a dangerous weapon.

ing these gloves to the crime committed. Our review cannot avoid the truth that an older, smaller man was struck in the face, realized no broken bones and no such injury as would be expected if weighted gloves had been used. We do not criticize the judgment call of the trial judge; in our view the evidence does not support the charge that calls for a greater sentence. We do find, however, an abundance of evidence to support a verdict of guilty of the lesser offense of assault, with force.

That being so, "[t]he conviction can stand, but with a sentence appropriate for the lesser included offense." *United States v. Ciongoli*, 358 F.2d 439, 441 (3rd Cir. 1966), *citing Robinson v. United States*, 333 F.2d 323 (8th Cir. 1964); *see also United States v. Carter*, 522 F.2d 666, 682 at n. 56 (D.C. Cir.1975); Rule 31(c), Federal Rules of Criminal Procedure.

We cannot avoid a confrontation with the sentence imposed upon the jury's verdict of the greater offense (assault *with* use of a deadly weapon). We do not possess, and do not here exercise, a review of the sentence given. *United States v. Mathis*, 579 F.2d 415 (7th Cir. 1978); *McCartney v. United States*, 382 F.2d 116, 118 (9th Cir. 1967). We do vacate the sentence because it was imposed under the greater offense, and remand the cause to the trial court for sentence under the lesser included offense of forcible assault, and without direction or suggestion on the part of this Court.

AFFIRMED IN PART, REVERSED IN PART AND REMANDED.